IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK HIGHTOWER and :
CHAMICKA POLLOCK, :
on behalf of themselves and all other :
similarly situated persons, : CIVIL ACTION
          Plaintiffs, : No. 17-04119
 :
    v. :
 :
WELLS FARGO BANK, N.A., :
          Defendant. :

**McHUGH, J.**                                                                                                              **March 28, 2018**

<u>**MEMORANDUM**</u>

      This is a putative class action brought on behalf of current and former African American employees of Defendant Wells Fargo. Plaintiffs Frank Hightower and Chamicka Pollock allege that Defendant has engaged in a pattern or practice of discrimination in the compensation and promotion of African American employees in mid- to upper-level management positions. Plaintiffs stand on different procedural footings. Mr. Hightower timely filed this action after exhausting his administrative remedies and receiving a right-to-sue letter from the Equal Employment Opportunity Commission (EEOC). Ms. Pollock also pursued administrative remedies, but failed to bring suit within the allotted ninety days after she received her right-to-sue letter. She seeks to surmount that obstacle by "piggybacking" on Hightower's claim.

      Wells Fargo seeks to bar Pollock's claims as untimely, and to strike Hightower's class action claims as beyond the scope of his EEOC charge and otherwise not certifiable under Rule 23. The motion as to Pollock will be granted, and her Title VII claims will be dismissed with

1

prejudice. The motion to strike Hightower's class action allegations will be granted, and those allegations stricken, but without prejudice.

## I. Factual Background

Plaintiffs' Amended Complaint alleges that Defendant Wells Fargo has engaged in a "companywide pattern and practice of employment discrimination" against African American employees. Am. Compl. ¶ 1, ECF No. 12. They allege that Defendant maintains "company-wide career advancement and/or promotion policies and practices that deny African-Americans the same career advancement/promotion and compensation as employees who are not African-American." *Id.* ¶ 4. As a result, African American employees are underrepresented in the company's mid-level and senior management and receive "substantially less" compensation than "their counterparts who are not African-American." *Id.* ¶ 3.

The career paths of Plaintiffs Hightower and Pollock capture the primary grievances they assert on behalf of themselves and other African American employees. Frank Hightower joined Wells Fargo as a branch manager in Chichester, PA, in 2012, receiving a starting salary of $48,000. He alleges that Defendant awarded salaries based on the "level" of the branch, with levels assigned based on branch size. Hightower alleges that his branch was the "largest in the district," and was thus designated as "Level 2," and that he was the only African American branch manager in his area. After speaking to other managers, none of whom were African American, he learned that managers of smaller branches, which were designated as "Level 1," received greater pay. *Id.* ¶¶ 7, 34–36.

Chamicka Pollock received an annual salary of $125,000 when she began working as a district manager in the greater Washington, D.C. region in 2011. She alleges that another employee who held the same position, Michael Ormande, was paid $140,000. *Id.* ¶ 37. She also

alleges that, throughout her career, she was denied promotional opportunities based on her race. From 2011 through the present, she applied for area president positions that opened up in Pennsylvania, Georgia, Virginia, and Washington, D.C. She alleges that "in almost each case" she advanced to a final interview, but a white candidate ultimately received the position. Pollock also alleges that in some instances branch managers whom she had trained, and who were therefore arguably less qualified for the position, received the promotion instead of her. *Id.* ¶ 38.

Plaintiffs contend that other African American employees have been subject to similar treatment. They allege that in September 2017, at least five qualified African American employees applied for a district manager opening in Northwest Philadelphia. Defendant awarded the position to a "White Hispanic" employee, Anthony Rosado, who was a "displaced area president." Defendant had laid off Rosado earlier that year, and Plaintiffs allege that Wells Fargo had previously passed him over for a "region bank president" position because he had been subject to "multiple sales violation investigations" in districts he previously managed. According to Plaintiffs, Rosado's history should have disqualified him from the promotion, and yet he received the position "over other more qualified African-American candidates." *Id.* ¶ 24. As further evidence of a pattern or practice of discrimination, Plaintiffs allege that, despite the existence of qualified African American candidates, none of the district managers in the Philadelphia area are African American. *Id.* ¶ 23.

Plaintiffs' Amended Complaint sets forth various means by which Defendant allegedly obstructs career advancement opportunities for African American employees. First, Defendant's human resources staff allegedly coordinates with management to "manipulate" the process for posting company-wide job announcements to favor "only their desired candidates." Defendant allegedly manipulates the process by either (1) directing a recruiter to "write the hiring profile to

specifically fit the pre-identified candidate," or (2) "filling the candidate pool with decoy candidates" who are "employed or were previously employed in the position to be filled." *Id.* ¶ 15. Second, Plaintiffs allege that, although Defendant uses standardized "Interview Guides" that prompt interviewers to ask the same questions of all interviewees, the interviewers "regularly fail to use the prompting questions provided to elicit a full response" from African American interviewees. In contrast, Plaintiffs allege, interviewers "use the prompting questions to elicit full responses from preferred applicants," thus yielding higher scores for preferred candidates. *Id.* ¶ 16. Third, with respect to compensation, Plaintiffs allege that Defendant uses compensation policies that disadvantage African American employees, in part by "relegating" African American employees to positions with capped, company-wide pay scales. *Id.* ¶¶ 27, 31.

## II. Procedural Posture

Both Hightower and Pollock filed timely charges with the EEOC. Ms. Pollock filed her charge in May 2015, in which she alleged that she had been subject to discrimination in her applications for area president positions. As noted above, the EEOC sent Ms. Pollock a "right-to-sue" letter in late March 2016, setting forth the ninety-day deadline, but she did not file a federal claim within that timeframe, or at any later point, until she emerged as a second named plaintiff in the Amended Complaint in this action in December 2017. Mr. Hightower's EEOC charge was filed in November 2016, alleging that Hightower and other African American employees had been subject to racial discrimination, and that Defendant had retaliated against him for reporting discrimination concerns to a district manager. Def.'s Ex. A, ECF No. 16-3. He filed the present action on September 14, 2017, within his ninety-day window. Compl., ECF No. 1. His Amended Complaint then added Ms. Pollock as an additional named plaintiff for his proposed class claims. Am. Compl., ECF No. 12.

**III. Analysis**

   **A. Timeliness of Pollock's Claims**

To proceed with a Title VII claim in federal court, a plaintiff must first file a timely charge with the EEOC, and then receive a right-to-sue letter. The individual has ninety days after receiving the letter to initiate a lawsuit. 42 U.S.C. §§ 2000e–5(e), (f)(1); *Mikula v. Allegheny Cty. of PA*, 583 F.3d 181, 185 (3d Cir. 2009). Ms. Pollock's claim is clearly untimely; she seeks to avoid dismissal by invoking the "single-filing" or "piggybacking" rule, a judicially-created exception for failure to exhaust that has been applied in both Title VII and ADEA cases. *See Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1057–58 (2d Cir. 1990) (describing various tests courts have used). Within the Third Circuit, a plaintiff who has not filed an EEOC charge may nonetheless in some instances join a Title VII action filed by another plaintiff who has exhausted administrative remedies if that case and the underlying charge lodged with the EEOC involve "class based discrimination." *Commc'ns Workers of Am. v. New Jersey Dep't of Pers.*, 282 F.3d 213, 217 (3d Cir. 2002) (citing *Lusardi v. Lechner*, 855 F.2d 1062, 1077–79 (3d Cir. 1988)).

This case, however, does not involve a failure to exhaust. To the contrary, Ms. Pollock filed a timely EEOC charge and fully participated in the administrative process. She received a right-to-sue letter, but then failed to proceed. The Third Circuit has not addressed this situation, but four other circuits—the Second, Fifth, Eighth, and Eleventh—have, and none allowed a plaintiff who failed to timely bring suit after receiving a right-to-sue letter to piggyback on another plaintiff's action. *Gitlitz v. Compagnie Nationale Air France*, 129 F.3d 554, 558 (11th Cir. 1997); *Anderson v. Unisys Corp.*, 47 F.3d 302, 309 (8th Cir. 1995); *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1223 (5th Cir. 1995); *Holowecki v. Fed. Exp. Corp.*, 440 F.3d 558, 565 (2d Cir. 2006), *aff'd*, 552 U.S. 389 (2008). Pollock has not explained why a rule designed to

protect claimants who did not pursue administrative remedies should be applied to someone who exhausted those remedies but did not sue within the period allowed by law.

Within the Third Circuit, the single-filing rule has its origins in *Lusardi v. Lechner*, where the Commission itself filed an *amicus* brief, arguing that a "representative complaint" satisfied the goals of an EEOC charge, in that it would serve to give an employer notice of a grievance, allow the EEOC to investigate, and provide an opportunity for conciliation of both the class claim and any related claims that would follow in its wake. 855 F.2d at 1077. But the rationale for the rule does not apply here. Pollock presented her individualized allegations to the EEOC well before Hightower lodged his charge. In fact, the EEOC had completed its investigation and issued its right-to-sue letter to Pollock in March 2016, some eight months before Hightower even filed his charge with the EEOC. Given that timeline, the Pollock investigation cannot be deemed to have been subsumed within the Hightower investigation, because the former was already complete. Moreover, the ninety-day window in which Ms. Pollock had to bring suit had expired before Hightower filed his charge, and as a result, she no longer had a viable claim with which to "piggyback."

Her Title VII claims are therefore untimely, and must be dismissed.[1]

**B. The Scope of Hightower's Charge**

Federal courts require that a plaintiff's claims fall within the scope of the underlying EEOC charge. *See generally Hicks v. ABT Assocs., Inc.*, 572 F.2d 960, 966 (3d Cir. 1978). This is not a strict standard, however, as the range of permissible claims is "defined by the scope of

---

[1] Ms. Pollock has also asserted individual pattern or practice and retaliation claims under 42 U.S.C. § 1981, Am. Compl. ¶¶ 59–62, 71–75, which Defendant has not moved to dismiss. Because § 1981 carries no administrative exhaustion requirement, she may proceed with these claims.

6

the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination . . . ." *Id.*

Defendant contends that the claims in the Amended Complaint exceed the scope of Hightower's EEOC charge.[2]  Def.'s Reply Br. 5–6, ECF No. 19 [hereinafter "Def.'s Reply"]; Def.'s Mot. Dismiss 4–5, ECF No. 16-2 [hereinafter "Def.'s Mot."].  Specifically, Defendant argues that Hightower has not exhausted his promotion and compensation claims because his charge (1) did not claim that he had been denied a promotion, and (2) did not allege that he had been subject to compensation disparities because of his race, but instead stated that he was denied salary increases in retaliation for concerns he raised with human resources.  Def.'s Mot. 6–8.

I find this reading of Hightower's charge overly formalistic.  His charge sets out a series of events beginning in July 2013, when Hightower notified Defendant's human resources department that a white district manager, Raymond Disandro, "was treating a white employee more favorably (in the form of a monetary raise) than similarly situated Black/African-American employees who were more qualified and performing better."  Def.'s Ex. A, ECF No. 16-3.  His charge then states that a series of retaliatory acts followed, including "continued harassment, static salary, despite excellent performance, approximately six (6) write-ups, and other unsubstantiated attempts at discipline and corrective action."  *Id.*  The charge also discusses Disandro's failure to respond to Hightower's complaint about a white employee's inappropriate racial comments.  He states that Disandro terminated Hightower and took his keys after Hightower reported his concerns again to human resources, that Defendant transferred him to an

---

[2] Because Pollock did not file a federal action within ninety days of receiving her right-to-sue letter, Hightower's charge provides the only basis on which Plaintiffs may proceed with a Title VII action.

7

Atlanta location after the Area President reinstated him, and that a district manager then terminated Hightower in September 2016. *Id.* The charge concludes by stating:

> I allege I have been discriminated against on the basis of my race (Black/African-American)[.] I also allege that other Blacks/African-Americans were treated unfavorably and denied promotional and salary advancement. I also allege I have been retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended.

*Id*.

The broad allegations of Hightower's complaint invite an EEOC investigation into class-wide pay and promotion claims. Hightower notified the EEOC, and thus Defendant, that he and other African-American employees had been denied salary advancement, and that other African-American employees were denied promotional opportunities. Although the charge states that it was not until after he reported Disandro to human resources that Hightower was not provided salary increases, given the overall context of the charge it is reasonably read as relating to Mr. Hightower's race, and not just retaliation. Federal courts recognize that plaintiffs must often file charges without representation, and do not require plaintiffs to state precisely the nature of each claim. *See Hicks*, 572 F.2d at 966–67 (finding dismissal of sex discrimination claims improper because, while plaintiff did not check the box for sex discrimination on his EEOC charge, a reasonable EEOC investigation may have resulted in discovery of sex discrimination, and the facts supporting race and sex discrimination shared a "close nexus"); *E.E.O.C. v. Kronos Inc.*, 620 F.3d 287, 300 (3d Cir. 2010) (recognizing that "the individuals who draft charges are often 'not well vested in the art of legal description' and as a result, 'the scope of the original charge should be liberally construed'"). I therefore find that Hightower's compensation claims fall within the scope of his charge.

The factual allegations in Hightower's charge could also support an individual promotion claim because pay and promotion are closely-linked issues. The Amended Complaint, for

example, alleges that Defendant limits pay advancement within the company by relegating African American employees to positions with maximum salary levels, akin to caps. *See* Am. Compl. ¶ 27. An EEOC investigation into Hightower's static salary allegation could therefore have revealed an overlap between discriminatory pay and promotion practices.

Hightower's charge was also sufficiently broad to support Plaintiffs' class allegations. In *Lusardi*, a plaintiff had filed a charge with the EEOC stating that the defendant

> has engaged and is continuing to engage in employment practices related to hiring, training, promotion and termination of past, present and future employees which discriminate against persons such as myself over forty as a class particularly with respect to the implementation of a reduction in salaried work force.

*Lusardi*, 855 F.2d at 1078. As the court noted, the charge did not specifically state that the plaintiff intended to bring a class action. Nonetheless, it held that the charge clearly notified the defendant that "it allegedly discriminates against persons over forty years old as a class." The Third Circuit added: "So long as class issues are alleged, a timely charge may serve as the basis for a class action." *Id.*

Here, Hightower's charge presents similar allegations. After alleging a series of actions indicating that managers and human resources staff had mistreated him and other African American employees, he specifically stated that he had been discriminated against on the basis of his race, and that African American employees generally had been subject to discriminatory treatment. Fairly read, the factual allegations in the charge describe treatment of African American employees beyond Hightower. He reported that he saw a white employee receiving better pay than African American employees in similar positions. The charge specifically states that "other Blacks/African-Americans were treated unfavorably and denied promotional and salary advancement." Def.'s Ex. A, ECF No. 16-3. The charge plainly provides notice that Hightower was alleging class-based issues relating to both pay and promotion. Hightower's

9

EEOC charge is therefore sufficient to support the Amended Complaint's full sweep of class allegations.

### C. Hightower's Class Allegations

That said, Hightower's class allegations as they currently stand do not meet the requirements for class certification, let alone a nationwide class. Under Federal Rule of Civil Procedure 23, a court may certify a class if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). While plaintiff could possibly satisfy most of these criteria at the class certification stage, the Complaint on its face fails to raise a question of "law or fact common to the class."

In moving to strike Plaintiffs' class allegations, Defendant argues that Plaintiffs cannot overcome the commonality standard set forth in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). *See* Def.'s Mot. 20–25. In *Dukes*, the Supreme Court recognized two ways in which a plaintiff could identify a common question linking individual claims of discrimination to a "class of persons who have suffered the same injury as that individual . . . ." *Id.* at 353 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–58 (1982)). A party could show commonality (1) if the employer used a "biased testing procedure" that applied to all members of the class, or (2) by offering "'[s]ignificant proof that an employer operated under a general policy of discrimination . . . if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decision-making processes.'" *Id.* at 353. The Court in *Dukes* found that the plaintiffs offered evidence only of a policy "allowing discretion by local

supervisors over employment matters," and failed to identify a "common mode of exercising discretion that pervades the entire company." *Id.* at 355, 359. Rejecting plaintiffs' statistical and anecdotal evidence of promotional disparities between men and women, the Court held that plaintiffs could not establish a common question by showing that a policy of discretion produces a disparity. *Id.* at 357.

Plaintiffs unpersuasively attempt to distinguish their allegations from those in *Dukes*. They suggest that Defendant's policies requiring managers to post open positions and requiring interviewers to use interview guides are different from policies allowing discretion, arguing that Defendant in fact does not leave discretion to hiring managers. Pls.' Br. 11, ECF No. 18. But the crux of Plaintiffs' Title VII theory is that managers abuse or manipulate these policies to limit the promotion of African American employees. Plaintiffs do not allege that any policy standing alone has a discriminatory effect. Rather, Plaintiffs suggest that the conduct of individual managers results in discrimination. In this regard, Plaintiffs' theory is similar to one challenging a policy that delegates discretion to managers. Plaintiffs' allegation that there are no African American managers in the Philadelphia region is certainly disturbing, Am. Compl. ¶ 23, but they provide no context as to how many managerial positions exist, and fail to allege a connection between the conduct of which they complain and this statistical reality.

Plaintiffs offer a conclusory assertion that Defendant's "Interview Guides are written and administered to be biased against African American candidates," Am. Compl. ¶ 16, but provide no further elaboration. This allegation could be read as suggesting that the Interview Guide itself might have a discriminatory effect. Under *Dukes*, such a theory would raise a common question for all class members subject to a given Interview Guide. But Plaintiffs instead emphasize that interviewers manipulate the guide by eliciting full responses only from preferred candidates, and

11

do not explain how the content of Defendant's Interview Guides might have a discriminatory effect.

Plaintiffs also allege that "Pay and compensation are regulated by a company-wide pay and compensation policy that is regularly maintained by the company and administered by its management." Am. Compl. ¶ 14. But Plaintiffs at no point assert that the pay and compensation policy has a discriminatory effect. Plaintiffs allege only that "Wells Fargo controls compensation by relegating African-American employees to certain positions which restricts those employees to the company-wide pay scale set for those positions." *Id*. ¶ 27. But as Plaintiffs have elsewhere alleged, discrimination in employee promotion results from the individual behavior of interviewers and hiring managers, so any discriminatory effect of Defendant's pay and compensation policies would trace to individual promotion decisions. Plaintiffs' allegations relating to pay and compensation policies therefore do not present a common question.

In response to Defendant's arguments, Plaintiffs rely solely on a Seventh Circuit case, *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012). There, the court found that a company's policies governing the distribution of client accounts and allowing brokers in a single office to form teams raised a common question satisfying Rule 23(a)(2). The court analogized the policies to a hypothetical "employment decision by top management" allowing police offers to select junior officers as their partners. The policy could have a disparate impact on junior officers' employment prospects, for example, if male officers rarely selected female junior officers as partners. This hypothetical case would be unlike *Wal-Mart*, the court reasoned, because the employment decision rested with top management, not local managers. *Id.* at 489. The teaming and account distribution policies in *McReynolds*

12

similarly raised common questions of whether the policies had a disparate impact given the possible prejudices that may shape individual brokers' teaming decisions, and if so, whether a defense of business necessity could nonetheless justify the policy. *Id.*

*McReynolds* does not govern here. Plaintiffs do not contend that Defendant's policies shape or enable discriminatory behavior. Instead, Plaintiffs' allegations raise questions as to whether managers or interviewers have individually taken actions that discriminate against African American employees. At most, Plaintiffs allege that "Wells Fargo does not ensure that the implementation of the Interview Guides are not used [sic] in a racially discriminatory manner." Am. Compl. ¶ 16. Such an observation could arguably raise a common question if, for example, pervasive manipulation of company protocol existed, top executives knew of the problem, and they did nothing to address it. *See, e.g.*, *Wal-Mart*, 564 U.S. at 355 ("To be sure, we have recognized that, 'in appropriate cases,' giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory—since 'an employer's undisciplined system of subjective decision-making [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination.'") (citing *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 990–91 (1988)). But aside from merely stating that Defendant took unsuccessful remedial steps following an unsatisfactory recruiting team audit in 2015, *id.* ¶ 17, Plaintiffs have not set forth enough detail to give plausibility to the allegations.

To plead a class-based discrimination case after *Dukes*, a plaintiff must identify, with some degree of precision, policies or systemic behavior that uniformly affects the proposed class members. The complaint here fails to do so, and as currently pleaded, is internally inconsistent in ways that make the case unlikely to be eligible for class certification. I will therefore strike

Plaintiffs' class allegations in Counts I and II under Rule 23(d)(1)(D),[3] albeit without prejudice.

### D. Pattern or Practice Allegations

In Count I, Pollock and Hightower have also asserted pattern or practice allegations on behalf of themselves under 42 U.S.C. § 1981, and in Count II, Hightower has asserted an individual pattern or practice claim under Title VII. Though Plaintiffs' class allegations are stricken, their individual pattern or practice claims will remain. Defendant has moved to dismiss all pattern or practice claims, arguing that Plaintiffs have merely attempted to elevate their individual claims into a pattern or practice theory without a plausible basis for doing so. Def.'s Mot. 12–17. But though Plaintiffs' pattern or practice allegations may overlap with their individual claims, the Amended Complaint sets forth factual allegations that encompass a broader pattern of behavior. Making all inferences in Plaintiffs' favor, and reviewing Defendant's motion under the standards set out in Federal Rule of Civil Procedure 12(b)(6) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiffs have sufficiently alleged a pattern or practice claim against Defendant. Defendant's motion to dismiss these claims is therefore denied.

### E. Disparate Impact Allegations

Defendant has also moved to dismiss Plaintiffs' disparate impact claims, and Plaintiffs have not opposed Defendant on this point. Pls.' Br. 3, ECF No. 18. The disparate impact claims are therefore dismissed, again without prejudice.

    /s/ Gerald Austin McHugh
United States District Judge

---

[3] Defendants also argue that Plaintiffs cannot seek certification under Rule 23(b)(2) to recover monetary damages, including backpay and compensatory damages. Def.'s Mot. 25–28. Because Plaintiffs are unable to satisfy the commonality requirement of Rule 23, I will not reach the issue of whether a class could be certified under Rule 23(b)(2) or Rule 23(b)(3).